

Minute Order Form (rev. 12/90)

# UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | ROBERT W. GETTLEMAN | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | 99 C 81 | Date | November 30, 2000 |
| Case Title | Hoogwegt US | v | Schenker International |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]
(2) ☐ Brief in support of motion due _____
(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____
(4) ☐ ☐ Ruling/Hearing on _____ set for _____ at _____
(5) ☑ Status hearing ☐ held ☐ continued to ☑ set for ☐ re-set for 12/19/00 at 9:00
(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____
(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____
(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
  ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)

(10) ☑ [Other docket entry]

MEMORANDUM OPINION AND ORDER ENTERED. ACCORDINGLY, DEFENDANT'S SCHENKER AND SEA-LANDS' MOTION FOR SUMMARY JUDGMENT IS GRANTED AS TO SCHENKER ON COUNT 1, AND DENIED AS TO SEA CARGO ON COUNT 2. SEA-LAND'S MOTION FOR SUMMARY JUDGMENT ON COUNT 3 IS GRANTED.

(11) ☑ [For further detail see ☐ order on the reverse of ☑ order attached to the original minute order form.]

| | |
|---|---|
| ☐ No notices required, advised in open court. | number of notices |
| ☐ No notices required. | |
| ☑ Notices mailed by judge's staff. | date docketed DEC 4 2000 |
| ☐ Notified counsel by telephone. | |
| ☐ Docketing to mail notices. | docketing dpty. initials |
| ☐ Mail AO 450 form. | |
| ☐ Copy to judge/magistrate Judge. | date mailed notice |
| courtroom deputy's Initials GS | Date/time received in central Clerk's Office | mailing dpty. initials |

FILED FOR DOCKETING
00 DEC -1 PM 4: 11

Document # 56

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HOOGWEGT U.S., INC., a Delaware corporation, )
)
    Plaintiff, )
)
v. ) No.   99 C 0081
)
) Judge Robert W. Gettleman
SCHENKER INTERNATIONAL, INC., a New )
York corporation, SEA CARGO SERVICE, a )
non vessel operating common carrier, and SEA- )
LAND SERVICE, INC., a Delaware corporation, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Hoogwegt U.S., Inc. has brought this maritime action alleging various breaches of contract in connection with the transport and delivery of approximately 800 tons of butter from the United States to Russia. In a three-count complaint, plaintiff has alleged that defendants Schenker International, Inc. ("Schenker") (Count I), Sea Cargo Services, Inc. ("Sea Cargo") (Count II) and Sea-Land Service, Inc. ("Sea-Land") (Count III), each breached the contract for the transport of the butter and caused plaintiff to incur damages in excess of $500,000. Schenker and Sea Cargo have jointly moved for summary judgment as to Counts I and II. Sea-Land has moved for summary judgment on Count III.

## FACTS

In 1997, Hoogwegt entered into a contract with INL Trading ("INL"), a foreign customer, for the sale and delivery of approximately 4,000 tons of butter. According to its contract with INL, Hoogwegt was to provide for the delivery of the butter to various points in Russia. In December of 1997, Hoogwegt retained Schenker, a freight forwarder, to arrange for the transport

of 40 refrigerated "reefer" shipping containers of the butter. Schenker arranged with its affiliate Sea Cargo, a Non-Vessel Operating Common Carrier ("NVOCC"), to prepare and issue the ocean bills of lading for these shipments of butter. Sea Cargo contracted with Sea-Land to ship door-to-door 25 of the "reefer" containers. Sea Cargo shipped the other 15 "reefer" containers via a steamship line, OOCL.

The shipments of the butter began in early 1998. The cargo began to arrive in Europe in late February 1998. During the intervening time, the butter market in Russia began to collapse and INL was having problems finding customers to buy the butter.

Of the 40 "reefer" containers, only the 25 that were shipped by Sea-Land eventually arrived at their final destination in Russia, but only after being delayed in port at Riga, Latvia while waiting to be shipped into Russia. The 15 containers that were transported via steamship line OOCL could not be routed into Russia and were returned to the United States.

Plaintiff claims that it has incurred substantial damages as a result of the non-delivery and delays, including, for the 15 containers that were returned to the United States: roundtrip ocean freight costs for the fruitless trip; demurrage charges; sampling and inspection costs; and a lost U.S. government export subsidy. For the remaining 25 containers, Plaintiff claims damages in the form of demurrage charges and shortage claims. Plaintiff has not claimed that any of the cargo was damaged.

## DISCUSSION

### Summary Judgment Standard

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment

2

as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F .3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F .2d 107, 110 (7th Cir.1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir.1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir.1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## Count I – Liability of Schenker

In Count I of the complaint, plaintiff claims that Schenker breached its contract with plaintiff by: failing to timely deliver all goods entrusted to it; failing to follow plaintiff's routing requirements; failing to follow instructions that were allegedly given orally by plaintiff; failing to prepare and deliver documentation needed for customs clearance; and, failing to provide information or responses to requests made by plaintiff.

3

Defendant Schenker has moved for summary judgment, arguing that: 1) plaintiff has not disclosed and quantified its damages sufficiently enough to withstand a motion for summary judgment; and 2) if plaintiff has incurred any damages, Schenker's liability is limited by the "Terms and Conditions of Service" section on the back of a proposal sheet that Schenker faxed to the plaintiff on December 3, 1997.

Although plaintiff has not done a good job of demonstrating causation of damages by each individual defendant, plaintiff has detailed a number of expenses that it incurred caused by the 40 containers being delayed or returned to the United States. Specifically, plaintiff has claimed damages for: round trip ocean freight costs for the 15 containers that were returned to the United States ($162,000.00); demurrage charges for the 15 containers ($36,641.89); sampling and inspection costs ($4,680.00); a lost U.S. government export subsidy ($345,870.00); and, demurrage charges for the 25 containers delayed in port at Riga, Latvia ($136,600.00). Plaintiff has sufficiently disclosed and quantified its damages. Accordingly, Schenker is not entitled to summary judgment on this issue.

Schenker is entitled to summary judgment, however, because its liability is limited by the "Terms and Condition of Service" section that is on the back of a proposal sheet that it faxed to the plaintiff on December 3, 1997. Although plaintiff argues that this limitation of liability section was never incorporated into the agreement, plaintiff offers no evidence to support its

position.[1] Even when drawing all reasonable inferences in a light most favorable to plaintiff, defendant Schenker is entitled to summary judgment.

The pertinent paragraphs of the "Terms and Conditions of Service" section are as follows[2]:

> 1. Services by Third Parties. Unless the Company carries, stores or otherwise physically handles the shipment, and loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier and is not to be held responsible for any loss, damage, expense or delay to the goods to be forwarded or imported except as provided in paragraph 10 and subject to the limitations of paragraph 8 below, but undertakes only to use reasonable care in the selection of carriers, truckmen, lightermen, forwarders, custom brokers, agents, warehousemen and others whom it may contract the goods for transportation, cartage, handling and/or delivery and/or storage or otherwise. When the Company carries, stores or otherwise physically handles the shipment, it does so subject to the limitation of liability set forth in paragraph 8 below unless a separate bill of lading, air waybill or other contract of carriage is issued by the Company, in which event the terms thereof shall govern.
>
> 2. Liability Limitations of Third Parties. The Company is authorized to select and engage carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen and others, as required to transport, store, deal with and deliver the goods, all of whom shall be considered as the agents of the Customer, and the goods may be entrusted to such agencies subject to all conditions as to limitation of liability for loss, damage, expense or delay and to all rules, regulations, requirements and conditions, whether printed, written or stamped, appearing in bills of lading, receipts or tariffs issued by such carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen and others. The Company shall under no circumstances be liable for any loss, damage, expense, or delay to the goods for any reason whatsoever when said goods are in custody, possession or control of third parties selected by the Company to forward, enter and clear, transport or render other services with respect to such goods.

\* \* \* \*

---

[1] The court faults the plaintiff for briefing its memorandum in opposition to motion for summary judgment in such a haphazard manner. Plaintiff's failure to cite to the record in its brief prolonged the ruling and caused the court to waste time and resources locating supporting material in the record.

[2] Contrary to plaintiff's contention, the copy of the "Terms and Condition of Service" section of the December 3, 1997, fax provided to the court in the defendant's 12M Statement, though difficult to read, is not illegible.

5

8. Limitation of $50 Per Shipment. The Customer agrees that the Company shall in no event be liable for any loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company for any amount in excess of $50.00 per shipment (or the invoice value, if less) and any partial loss or damage for which the Company may be liable shall be adjusted pro rated on the basis of such valuation. The Customer has the option of paying a special compensation to increase the liability of the Company in excess of $50.00 per shipment in case of any loss, damage, expense or delay from causes which would make the Company liable, but such option can be exercised only by specific written agreement made with the Company prior to shipment, which agreement shall indicate the limit of the Company's liability and the special compensation for the added liability by it to be assumed.

\* \* \* \*

10. Liability of Company. It is agreed that any claim or demand for loss, damage, expense or delay shall be only against the carriers, truckmen, lightermen, forwarders, customhouse brokers, agents, warehousemen or others in whose actual custody or control the goods may be at the time of such loss, damage, expense or delay and that the Company shall not be liable or responsible for any claim or demand from any cause whatsoever, unless in each case the goods were in the actual custody or control of the Company and the damages alleged to have been suffered be proven to be caused by the negligence or other fault of the company, its officers or employees, in which event the limitation of liability set forth in paragraph 8 herein shall apply. The Company shall not in any circumstances be liable for damages arising from loss of profit.

Negotiations between plaintiff and Schenker began with the December 3, 1997, proposal sheet that was faxed from Norbert Ribarsch, sales representative for Schenker, to Steven Starzec, traffic manager for plaintiff. The negotiations continued through late January of 1998 and included oral conversations and the transmission of quote sheets between the two agents.

Plaintiff has alleged that Ribarsch agreed, during the December 3, 1997, negotiations, to a number of requirements that plaintiff insisted be part of the contract. These requirements were that: 1) plaintiff had to be named as the shipper of record on the steamship line's master bill of lading; 2) carriage was to be via Sea-Land Services, through the port of Riga, Latvia or Kotka,

Finland; 3) a customs device known as a TIR Carnet was required; 4) routing through the Port of St. Petersburgh, Russia, was absolutely unacceptable; and 5) the use of an NVOCC was unacceptable. Plaintiff has further alleged that Starzec requested that Ribarsch provide him with a "performance guarantee" that incorporated these requirements.

Defendant denies ever agreeing to any of the shipping requirements that would have constituted the alleged "performance guarantee." Plaintiff has denied that it ever agreed to or even read the "Terms and Conditions of Service" section on the back of the December 3, 1997, fax. Instead, plaintiff claims that it mistakenly believed the "Terms and Conditions of Service" section in the fax was actually the "performance guarantee."

An examination of the December 3, 1997, fax reveals that the "Terms and Conditions of Service" section was clearly referenced in the body of the fax. Further, the actual "Terms and Conditions of Service" section was clearly labeled as such. Plaintiff's claim that Starzec thought this to be the alleged "performance guarantee" is unexcusable in light of the obvious limitations of liability contained in the terms and conditions. Indeed, the December 3 fax was not the last time that Schenker put plaintiff on notice that it was contractually limiting its liability in this transaction.

On January 12, 1998, Ribarsch sent Starzec a fax informing him that "[t]he pricing, service, performance and liability will be in accordance to our quotation dated December 3, 1997." A copy of the December 3, 1997, fax, which included the "Terms and Condition of Service" section, was attached to the January 12, 1998, fax.

Having had numerous opportunities to examine these documents, plaintiff cannot now claim not to have had notice of the "Terms and Conditions of Service" that limited Schenker's

7

liability. To hold otherwise would be to reward plaintiff for burying its head in the sand and then claiming that it didn't see anything. Accordingly, plaintiff is bound by the "Terms and Conditions of Service," and defendant Schenker is entitled to summary judgment on Count I.

### Count II – Liability of Sea Cargo

In Count II of the complaint, plaintiff claims that Sea Cargo breached its contract with plaintiff by: failing to timely deliver all good entrusted to it; failing to follow plaintiff's routing requirements; failing to follow instructions that were allegedly given orally by plaintiff; failing to prepare and deliver documentation needed for customs clearance; and failing to provide information or responses to requests made by plaintiff.

Defendant Sea Cargo, an NVOCC, has moved for summary judgment arguing that it is not liable to plaintiff because: 1) its liability to plaintiff is limited by Paragraph 4 of the terms and conditions of its bill of lading; and 2) consequential damages are not recoverable under the Carriage of Goods at Sea Act, 46 U.S.C. § 1300, et seq. ("COSGA").

According to Paragraph 4 of the terms and conditions of the bill of lading issued by Sea Cargo, it is not liable for "any direct, indirect or consequential loss or damage caused by delay or any other cause whatsoever." Plaintiff, however, argues that it is not bound by the limitation of liability on the bill of lading because it never was issued the bill of lading and had no knowledge of the limitation of liability provision contained in Paragraph 4. Because a question of material fact remains as to whether plaintiff had any contractual relationship with Sea Cargo, and whether the bill of lading applies to a contract of carriage, if one exists, between plaintiff and Sea Cargo, summary judgment on this issue must be denied.

8

After Schenker contracted with plaintiff to arrange for the transport of the containers, Schenker, as agent for Sea Cargo, issued a bill of lading with plaintiff named as the shipper. Sea Cargo, as a carrier, had a duty, either under common law or under COSGA, to issue to the shipper a bill of lading upon request. See 2A Michael F. Sturley, Benedict on Admiralty (1995). Despite requests from plaintiff, neither Sea Cargo nor Schenker, as agent for Sea Cargo, ever issued the bill of lading to plaintiff. Sea Cargo, therefore, is unjustified in relying on the limitation of liability provision in the bill of lading to disclaim liability to plaintiff.

Citing Mojica v. Authoridad de Las Naviers de Puerto Rico, 1994 AMC 1316 (D.P.R. 1993), Sea Cargo also argues that consequential damages are never recoverable under the COSGA. Sea Cargo's reliance on Mojica for this proposition, however, is misguided. Relying on a passage from a treatise, 2 S. Sorkin, Goods in Transit, § 11.10[1](a) at 11-89-90, the Mojica court simply stated that "consequential damages *have been held* not to be recoverable in COGSA cases under any circumstances." Mojica, 1994 AMC 1316. (emphasis added). In fact, outside of Puerto Rico consequential damages have been held proper in COGSA cases. See Westport Petroleum, Inc. v. The M/T OSIMA SPIRIT, 111 F.Supp.2d 427, 2000 WL 1277297 (S.D.N.Y. 2000); Anyangwe v. Nedlloyd Lines, 909 F.Supp. 315 (D.Md. 1995).

Because COSGA does not preclude consequential damages, and because material facts are disputed regarding whether Sea Cargo may rely on the bill of lading to limit its liability, Sea Cargo maybe liable for consequential damages to plaintiff. Sea Cargo's motion for summary judgment as to Count II of the complaint is denied.

## Count III – Liability of Sea-Land

In Count III of the complaint, plaintiff alleges that defendant Sea-Land knew that plaintiff was a third party beneficiary of its contract with Sea Cargo and Schenker, and breached its contract by: failing to timely deliver all goods entrusted to it; failing to follow plaintiff's, Schenker's and Sea Cargo's routing requirements; failing to adequately prepare and deliver customs documents; failing to provide information or responses to requests by plaintiff; and, providing inadequate containers for the butter. Defendant Sea-Land has moved for summary judgment, arguing that it fully performed the contract and timely delivered the 25 containers of butter to port at Riga, Latvia.

In mid-January of 1998, Schenker and Sea-Land contracted to transport 25 containers of butter from the United States to Russia via port at Riga, Latvia. Sea-Land was required to provide, and in fact did provide, a customs document known as a TIR Carnet. In late-January or early-February of 1998, Sea-Land began to prepare for the voyage by loading the containers onto ships at Long Beach, California and Houston, Texas. As each ship was loaded, Sea-Land issued "on board" bills of lading to Sea Cargo, subsidiary of Schenker. Sea Cargo was listed as the shipper of record on these bills. The bills of lading listed the gross weight of each container. The container weights were provided to Sea-Land by Schenker. The container weights were incorrect.

The 25 containers that were being carried by Sea-Land arrived in port at Riga, Latvia on February 23, 1998, and March 3, 1998. Riga port authorities weighed the containers and discovered a discrepancy between the actual container weights and the container weights stated on the bills of lading. The port authorities insisted that new bills of lading be issued providing

10

the correct weights of the containers. On February 26, 1998, Sea-Land informed Schenker that changes needed to be made to the bills of lading to reflect the actual weights of the containers in order to avoid problems on entry into Russia. Over the next month, the cargo sat in port while Sea-Land awaited proper bills of lading, detailed delivery instructions and written authorization from its shipper of record to move the cargo to its final destination. During this time in port, plaintiff allegedly incurred substantial demurrage charges. Beginning on April 6, 1998, and continuing through April 13, 1998, the cargo arrived at its final destination in Moscow, pursuant to instructions from Schenker. Plaintiff's customer, INL, accepted the containers at Moscow and none of the 25 containers were returned to the United States.

Sea-Land argues that any claim for damages is the responsibility of Schenker because Schenker, listed as cosignee, and its affiliate Sea Cargo, the shipper of record, had ultimate control of the cargo. The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers. Southern Pacific Transportation Co. v. Commercial Metals Co., 456 U.S. 336, 342 (1982). Accordingly, Sea-Land was required to follow Schenker's instructions and is not liable for the delays.

In response to defendant Sea-Land's motion for summary judgment, plaintiff has claimed: 1) that Sea-Land originally agreed to carry all 40 containers, and that all subsequent damages flow from its alleged inability to do so; 2) that Sea-Land had all necessary delivery instructions and documentation for the goods in port at Riga, Latvia by March 20, 1998, and that the refusal of Sea-Land to move the goods until early April was wrongful; and 3) the containers moved by

Sea-Land arrived in Russia with shortages. Because no question of material fact exists as to the plaintiff's contentions, defendant Sea-Land's motion for summary judgment is granted.

Plaintiff's first argument is not supported by any evidence. In fact, plaintiff's own export manager, Renee Raber, testified at her deposition that she believed that the reason that the other 15 containers were shipped with OOCL was because Schenker booked the carriage with OOCL due to rate discrepancies. Raber also testified that she did not believe that Schenker had a contract in place with Sea-Land during the relevant time period. There is no question of material fact as to whether Sea-Land breached an alleged original booking and thus proximately caused all of the eventual delays.

Plaintiff argues next that Sea-Land had all necessary delivery instructions and documentation needed to deliver the containers on March 20, 1998. However, Sea-Land did not receive authorization from the party listed as both shipper and cosignee, Sea Cargo and Schenker, respectively, on the bill of lading until April 1998. Any liability, therefore, for the delay of the goods would fall upon Schenker or Sea Cargo, as shipper or cosignee, and not its carrier Sea-Land.

Finally, plaintiff claims that the containers carried by Sea-Land arrived in Russia with shortages. Although plaintiff's customer, INL, may have made a claim for shortages, plaintiff refused to pay any claim for shortages in a letter dated February 1, 1999. Plaintiff was paid in full by INL for all of the butter that it had shipped. Accordingly, plaintiff has suffered no damages related to the alleged claim of shortages. Plaintiff's contention is therefore insufficient to raise an issue of material fact.

Because plaintiff has failed to raise a question of material fact sufficient to withstand defendant Sea-Land's motion for summary judgment, Sea-Land's motion is granted.

## CONCLUSION

Based upon the foregoing, the court grants Schenker's motion for summary judgment on Count I, denies Sea Cargo's motion on Count II, and grants Sea-Land's motion on Count III. This matter is set for a report on status on December 19, 2000, at 9:00 a.m.

**ENTER:** **November 30, 2000**

_____
**Robert W. Gettleman**
**United States District Judge**